## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:09CR291 |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | RECOMMENDATIONS |
| JOHN R. BRIASCO and | ) | |
| CLAUDETTE A. TRAVER, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants John R. Briasco's (Briasco) and Claudette A. Traver's (Traver) Motion to Suppress (Filing Nos. 24 and 28). The defendants are charged in the Superseding Indictment with possession with intent to distribute more than 50 kilograms, but less than 100 kilograms of a mixture or substance containing a detectable amount of marijuana on or about June 3, 2009, in violation of 21 U.S.C. § 841(a)(1) and (b)(1). **See** Filing No. 42. The defendants seek to suppress all evidence obtained by law enforcement officers following a traffic stop on June 3, 2009.

The court held an evidentiary hearing on February 16, 2010. Briasco was present with his counsel, Assistant Federal Public Defender, Jeffrey L. Thomas. Co-defendant Traver was present with her counsel, Carlos A. Monzon. Assistant United States Attorney Justin C. Dawson represented the United States. During the hearing, the court received into evidence video disks of the traffic stop (Exhibits 1 and 1A), photos of items in the vehicle (Exhibits 101 and 103), the rental vehicle contract (Exhibit 102), certificates of achievement (Exhibits 2 and 3), a police service dog report (Exhibit 4), and police service dog performance documentation (Exhibit 5). **See** Filing No. 61. Nebraska State Patrol (NSP) Troopers Paul Hazard (Trooper Hazard) and Russell Lewis (Trooper Lewis) testified at the hearing. **See** Filing No. 60. A transcript (TR.) of the hearing was filed February 25, 2010, upon which the motion was deemed submitted. **See** Filing No. 65.

**FINDINGS OF FACT**

Trooper Hazard has been employed with the NSP since 2002, and assigned to the traffic services division for approximately three years (TR. 4). On June 3, 2009, Trooper Hazard observed a vehicle speed up while in a road construction zone on Interstate 80, west of the Kearney interchange, where single lane traffic opened to two lanes traveling eastbound (TR. 11, 13). Trooper Hazard's police cruiser was equipped with front and rear radar antennas, which were tested and functioned properly on June 3, 2009 (TR. 10). The vehicle was traveling toward Trooper Hazard when he activated his front radar and detected the vehicle's speed at 75 miles per hour (mph) in a 55 mph zone (TR. 13). As the vehicle passed, Trooper Hazard activated his rear radar and detected the vehicle maintained a speed of 75 mph as it passed under the Kearney overpass (TR. 13-14). Because the vehicle was traveling 75 mph in a 55 mph construction zone, Trooper Hazard initiated a traffic stop for speeding (TR. 11).

Upon initiating the traffic stop, Trooper Hazard approached the vehicle and asked the driver for his license and registration, and advised him of the reason for the stop (TR. 18). The driver of the vehicle identified himself with a Massachusetts driver's license as Briasco (TR. 12). The passenger in the vehicle, Traver, identified herself with a driver's license as well (TR. 12). While Briasco retrieved the vehicle's rental documentation, Trooper Hazard noticed two suitcases on the back seat, an overwhelming odor of air freshener emitting from the vehicle, and the back end of the car was "sagging" or "squatting" (TR. 19, 32). When Trooper Hazard asked about the vehicle's trunk, both Briasco and Traver stated the vehicle's trunk was empty (TR. 32). Once Briasco produced the vehicle's rental documentation, Trooper Hazard asked Briasco to accompany him back to his police cruiser (TR. 20).

Upon returning to his police cruiser, Trooper Hazard conducted licence status checks, warrant checks, and criminal history checks on Briasco and Traver (TR. 21). While waiting for NSP communications to respond regarding Briasco's and Traver's record checks, Trooper Hazard questioned Briasco about his travel itinerary and occupation (TR. 22). Briasco mentioned he and his girlfreind, Traver, had flown from Boston, Massachusetts, to Las Vegas, Nevada, but were driving across country "to be able to see the beautiful sights" (TR. 25). Briasco stated he planned to attend a poker training class

in Lincoln, Nebraska, and then stop in Chicago, Illinois, to gamble, but could not provide the name of the casino where he intended to gamble (TR. 23). In addition, Briasco was unclear on his final destination, but mentioned Chicago or Boston as possibilities (TR. 25). A brief inquiry with Traver, while Trooper Hazard returned her documentation, revealed similar information (TR. 28).

Trooper Hazard also inquired about Briasco's criminal history. Briasco stated he had been in a "little trouble," a long time ago, but nothing serious (TR. 26). Meanwhile, NSP communications advised Trooper Hazard that Briasco had a recent criminal history (TR. 26). Briasco's criminal history included distribution of cocaine, possession of a controlled substance, assault and battery with a weapon, and other burglary and firearms charges (TR. 26-27). Trooper Hazard additionally conducted an El Paso Intelligence Center (EPIC) check (TR. 27). The EPIC check revealed an open Bureau of Alcohol, Tobacco, and Firearms and Explosives case involving Briasco (TR. 27).

Thereafter, NSP communications advised Trooper Hazard that Briasco and Traver had valid driver's licenses and no outstanding warrants (TR. 28). Whereupon, Trooper Hazard issued a warning, returned Briasco's documents, and advised Briasco he was free to go (TR. 28-29). After Briasco exited the police cruiser, Trooper Hazard asked Briasco if he would be willing to answer a few more questions (TR. 29). Briasco sat back in the police cruiser and agreed to the inquiry (TR. 29). In response to Trooper Hazard's additional questions, Briasco stated he was unsure whether he would attend the poker training class because he had not yet signed up, or whether he would stop and gamble in Chicago (TR. 30-31). According to Trooper Hazard, Briasco seemed nervous throughout the traffic stop, but his nervousness continued to escalate (TR. 31, 40). Trooper Hazard observed Briasco become cotton-mouthed, and his carotid artery pounded noticeably (TR. 31). Trooper Hazard inquired further regarding the presence of any illegal narcotics, weapons, or large amounts of U.S. currency in the vehicle (TR. 31). Briasco verbally stated "no" to every question, but when asked specifically about marijuana, Briasco emphatically emphasized his answer with hand and head gestures (TR. 32).

Trooper Hazard asked Briasco for permission to search the vehicle (TR. 33). Briasco denied the search request (TR. 33). Trooper Hazard, based on his training and observations, then explained to Briasco and Traver they would be detained for a police

service dog search and were not free to leave (TR. 33). Approximately 18 minutes elapsed from the time Trooper Hazard initiated the traffic stop until he made a request for a police service dog (TR. 34). NSP communications dispatched the closest available on-duty NSP Trooper with a service dog to the traffic stop in accordance with NSP procedure (TR. 58, 118). A request to another agency for a service dog is made only if NSP Troopers are unavailable (TR. 119).

While on patrol near mile marker 340 on Interstate 80, Trooper Lewis, a police service dog handler, was dispatched to Trooper Hazard's location (TR. 96-98). Trooper Lewis, accompanied by his certified police service dog Bruno, arrived on scene approximately 42 minutes after Trooper Hazard requested a service dog (TR. 98; Exhibit 1A). Trooper Lewis deployed the service dog around the exterior of Briasco's vehicle (TR. 100). The service dog alerted and gave an indication to the odor of narcotics emitting from the rear of Briasco's vehicle (TR. 105). Troopers Hazard and Lewis opened the vehicle's trunk and located nylon duffle bags containing marijuana bales (TR. 110). Accordingly, Briasco and Traver were placed under arrest (TR. 48).

## LEGAL ANALYSIS

### A.   Traffic Stop

The defendants argue Trooper Hazard did not have reasonable suspicion or probable cause to stop the vehicle on June 3, 2009. As a result, the defendants allege, Trooper Hazard violated Briasco's and Traver's Fourth Amendment rights under the United States Constitution. **See** Filings Nos. 24 and 28. For these reasons, the defendants seek to suppress any evidence resulting from the June 3, 2009, traffic stop.

"A traffic violation, no matter how minor, creates probable cause for a law enforcement officer to stop the vehicle." *United States v. Lopez,* 564 F.3d 1001, 1003 (8th Cir. 2009) (**citing** *United States v. Blaylock*, 421 F.3d 758, 767 (8th Cir.2005)). Trooper Hazard observed, and his radar detected, Briasco's vehicle traveling in excess of the posted speed limit in a construction zone on Interstate 80. Nebraska law provides, "[a]ny person who operates a vehicle in violation of any maximum speed limit established for any highway or freeway is guilty of a traffic infraction." **See** Neb. Rev. Stat. § 60-682.01(1). The posted speed limit in the construction zone was 55 mph, and it is

undisputed Briasco's vehicle was traveling 75 mph.  Accordingly, Trooper Hazard had probable cause to stop Briasco's vehicle for speeding.

**B.     Detention**

The defendants argue the detention was extended beyond the reasonable scope of the traffic stop and unreasonably prolonged.  **See** Filing Nos. 24 and 28.  The government argues Trooper Hazard had reasonable suspicion sufficient to justify extension of the traffic stop and the defendants' detention for a dog sniff of the vehicle, and therefore, the length of the defendants' detention was not unreasonable.  **See** Filing No. 41.

Contemporaneous with a valid traffic stop, "the officer [is] entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *Untied States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (**quoting** *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam)).  In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation.  *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Additionally, the police officer may inquire about the driver's and other occupants' destination, purpose of the trip, and whether the police officer may search the vehicle.  *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made by the police officer regarding illegal drug use, and divergent information from the passengers.  *United States v. $404,905.00*, 182 F.3d 643, 647 (8th Cir. 1999).

Once the officer decides to let a routine traffic offender depart with a ticket, a warning, or an all clear, "the Fourth Amendment applies to limit any subsequent detention or search." *Lyons,* 486 F.3d at 371 (**citing** *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006)).  The officer cannot continue to detain a motorist after the initial stop is completed unless the officer has "a reasonably articulable suspicion for believing that criminal activity [is] afoot."  *Id.* at 371; **see** *United States v. Beck,* 140 F.3d 1129, 1134 (8th Cir. 1998).  "If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion

5

unrelated to the traffic offense.'" *Id.* at 371 (**citing** *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994)) (en banc) (**quoting** *United States v. Cummins,* 920 F.2d 498, 502 (8th Cir. 1990)).

In determining whether Trooper Hazard had reasonable suspicion, the court must consider the totality of the circumstances in light of the officer's experience. **See** *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir. 2004) (**citing** *United States v. Arvizu,* 534 U.S. 266 (2002)). "Although each factor giving rise to reasonable suspicion may appear innocent when viewed by itself, 'a combination of factors may warrant further investigation when viewed together.'" *Id.* at 929 (**quoting** *U.S. v. Linkous,* 285 F.3d 716, 720 (8th Cir. 2002)). The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Washington,* 109 F.3d 459, 465 (8th Cir. 1997). This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza,* 421 F.3d 663, 667 (8th Cir. 2005) (**quoting** *United States v. Caves,* 890 F.2d 87, 93 (8th Cir. 1989)).

Trooper Hazard noticed several factors warranting further investigation when he initially approached Briasco's vehicle and requested the defendants' identification. The factors included two suitcases located on the back seat of the vehicle, a strong odor of air freshener emitting from inside the vehicle, and the back end of the vehicle was sagging. After Trooper Hazard noticed these factors, Trooper Hazard asked Briasco to accompany him to the police cruiser. Trooper Hazard engaged Briasco in conversation about the rental vehicle, travel itinerary, and any previous encounters with law enforcement while he preformed routine checks on the both defendants' driver's licences, criminal histories, and outstanding warrants. Briasco displayed nervousness, vaguely described his travel details, and did not fully disclose facts about his criminal history. Traver was similarly vague and unsure about the defendants' travel itinerary.

Trooper Hazard issued Briasco a warning, returned his identification and vehicle documents, and indicated Briasco was free to leave. After Briasco exited the police cruiser, Trooper Hazard asked to speak with him further. Briasco agreed to the further questioning. Trooper Hazard asked Briasco clarifying questions regarding his travel

6

itinerary and the presence of any contraband in the car.  Briasco became increasingly nervous, and at one point, Trooper Hazard noticed the defendant's carotid artery was pounding and Briasco had developed cotton-mouth.  Trooper Hazard requested consent to search Briasco's vehicle.  Briasco denied consent.  However, based on Briasco's wavering answers regarding his travel itinerary, Briasco's extensive criminal history, Trooper Hazard's observations, and the circumstances surrounding the traffic stop, Trooper Hazard had developed reasonable suspicion of contraband and informed the defendants he requested a police service dog to perform a dog sniff of the exterior of the vehicle.

Trooper Hazard's request for the service dog occurred approximately 18 minutes after the initial stop.  Within those 18 minutes, Trooper Hazard performed routine record checks, issued the warning, and completed a consensual encounter with Briasco.  Accordingly, at no point did Trooper Hazard unreasonably prolong the traffic stop.  Furthermore, under the totality of the circumstances, Trooper Hazard had reasonable suspicion of criminal activity beyond the initial traffic stop, and therefore, was justified in detaining the defendants beyond the scope of the traffic stop for a dog sniff.

## C.     Dog Sniff and Subsequent Search

The defendants argue the detention for the dog sniff was unreasonably lengthy.  Additionally, the defendants allege the warrantless search was unjustified.  **See** Filing Nos. 24 and 28.  The government argues the detention for the dog sniff was not unreasonable because the Troopers acted diligently and without undue delay, and furthermore, the service dog's indication to the odor of narcotics at the rear of the vehicle justified the Troopers' search of the vehicle's trunk.  **See** Filing No. 41.

A dog sniff may be the product of an unconstitutional seizure if the traffic stop is unreasonably prolonged before the dog is employed.  *Lyons*, 486 F.3d at 372 (**citing** *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005)).  However, "[w]hen police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one. . . the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times."  *Id.* at 372 (**citing** *Bloomfield*, 40 F.3d at 917).  The dog sniff of the vehicle did not constitute a "search" within the meaning of the Fourth

Amendment. "A dog sniff is not a search within the meaning of the Fourth Amendment, and thus requires no probable cause to be performed." *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). "A short detention for a dog sniff after the completion of a traffic stop does not violate the Fourth Amendment." *Linkous*, 285 F.3d at 721. This is because "a canine sniff of the exterior of personal property in a public location 'is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.'" *$404,905.00*, 182 F.3d at 647 (**quoting** *United States v. Place*, 462 U.S. 696, 707 (1983) (luggage at an airport)). Furthermore, the principle also applies to the canine sniff of the exterior of a vehicle because "[t]he exterior of a car. . . is thrust into the public eye, and thus to examine it does not constitute a 'search.'" *Id.* (**quoting** *New York v. Class*, 475 U.S. 106, 114 (1986). A police service dog's alert to the odor of drugs in a vehicle provides probable cause that drugs are present. *Untied States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005). After probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement. *Id.* at 976.

Trooper Hazard requested an available police service dog within 18 minutes of initiating the traffic stop. Trooper Hazard had reasonable suspicion the defendants were in possession of narcotics and he was denied consent to search the vehicle. Following NSP procedure, NSP communications dispatched the nearest on-duty NSP Trooper and service dog team to the location of the traffic stop. Trooper Lewis arrived with the police service dog within 42 minutes of Trooper Hazard's request. There is no evidence that Troopers Hazard or Lewis unduly delayed the arrival of the police service dog. *Lyons,* 486 F.3d at 372-73; **see** *United States v. Donnelly,* 475 F.3d 946, 951, 954 (8th Cir. 2007) (holding that a fifty-nine minute detention to wait for a drug dog was reasonable where the officer requested the dog immediately after developing reasonable suspicion); **see also** *United States v. White,* 42 F.3d 457, 460 (8th Cir. 1994) (determining that it was reasonable for an officer to detain a truck for eighty minutes while awaiting the arrival of a drug dog where the officer "acted diligently to obtain the dog, and the delay was caused only by the remote location of the closest available dog"). Therefore, the amount of time the defendants waited for the police service dog to be employed was not excessive or unreasonable.

Once the police service dog arrived, the dog indicated the odor of narcotics in the rear of the vehicle, and thereby established probable cause narcotics were present. Accordingly, Troopers Hazard and Lewis justifiably opened the trunk of the vehicle to search and discovered large nylon bags filled with marijuana. Upon consideration,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

John R. Briasco's motion to suppress ([Filing No. 24](#)) be denied.

Claudette A. Traver's motion to suppress ([Filing No. 28](#)) be denied.

### ADMONITION

Pursuant to [NECrimR 59.2](#) any objection to these Findings and Recommendations shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of these Findings and Recommendations. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 19th day of March, 2010.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.